**SO ORDERED.**

**SIGNED this 06 day of October, 2009.**



_____
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

Opinion not designated for on-line use or print publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **In re:** | |
| MARTIN L. SHOEMAKER and<br>JODI E. SHOEMAKER, | CASE NO. 08-21591<br>CHAPTER 7 |
| DEBTORS. | |

**MEMORANDUM OPINION AND ORDER ON
MOTION OF CITIZENS STATE BANK FOR RELIEF FROM STAY AND
DEBTORS' AMENDED MOTION TO AVOID LIEN OR
IN THE ALTERNATIVE TO REDEEM PERSONAL PROPERTY**

Following trial on April 14, 2009, the Court took under advisement this dispute concerning Debtors' right to retain four horses, two cows, and two calves in which Citizens State Bank (hereafter Bank) asserts a lien. Bank filed a motion for relief from stay "to foreclose on its secured collateral, including the cattle."[1] Debtors objected and also filed a Motion to Avoid

---

[1] Doc. 35.

Lien[2] and later filed an Amended Motion to Avoid Lien or in the Alternative to Redeem Personal Property[3] with respect to the livestock. An evidentiary hearing was held. Debtor Jodi Shoemaker appeared in person and by her counsel, Mark A.C. Wortman. The Bank appeared by Richard C. Wallace of Evans & Mullinix, P.A. There were no other appearances. Having considered the testimony, the exhibits, and the pleadings the Court is now ready to rule. For the reasons stated below, the Court grants the Bank's motion for relief from stay as to the cows and calves, denies the Bank's motion as to the horses, and denies the Debtors' motion to avoid lien or redeem. The Court has jurisdiction.[4]

**FINDINGS OF FACT.**

Prior to December 2007, Martin Shoemaker was the owner operator of Concrete Walls, a foundation company. He made about $75,000 per year. Debtors also made money breeding cows. Heifer calves were retained to build a herd and bull calves were either butchered or sold. In the last three years, they had lost money. Over Debtor Jodi Shoemaker's lifetime she has sold 300 to 400 head and butchered about 100. From 2001 through 2006, they had approximately 40 head and sufficient land for them. When they moved between 2005 and 2006, they had less land

---

[2] Doc. 42.

[3] Doc. 62.

[4] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. A motion to avoid lien or redeem and a motion for relief from stay are core proceedings which this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(K), (B), and (G). There is no objection to venue or jurisdiction over the parties.

and reduced the herd. In 2006 and 2007, the Bank received approximately $6,040 from Debtor's sale of cattle.

At the time of filing bankruptcy in July, 2008, Debtor Martin Shoemaker was unemployed, and codebtor, Jodi Shoemaker, was employed as a LPN at a nursing home, earning about $2,000 per month.[5]

The bankruptcy schedules list eight cows, four of which either died or were put down before trial, leaving two heifers, one calf, and a dwarf calf. Debtor Jodi Shoemaker testified that the dwarf is worth approximately $25, the two heifers approximately $500 each (based upon a total weight of about 900 to 950 pounds and a price of $.52 to $.556 per pound), and the calf approximately $450 (based upon a weight of about 500 pounds and a price of $.90 per pound), for a total of $1,475. Jodi Shoemaker has the expectation to build a herd of five to six cattle so she can sell cattle at the end of the year as supplemental income.

At the time of filing and at the time of trial, Debtors owned four horses. They are used for family recreational pursuits and are very important to Jodi Shoemaker. Rose is a registered quarter horse mare who was very competitive and was the primary horse that Jodi rode in rodeos. She had a large value at one time and was insured for $50,000 from 1999 to 2002. She made money from 1998 to 2006. In 2001 she had a cut joint from which she recovered. Although in 2004 her knee blew out, she was still able to compete. During a barrel race in 2006 in Mississippi, she snapped a tendon causing her to break her back leg. She can no longer race but is breedable, although it would take a lot of care to get a baby from her. According to Jodi, even

---

[5] At the time of trial, Martin was employed in Iraq as a construction supervisor, and Jodi continued to be employed as a LPN at a nursing home.

3

though Rose's colt would have value, no one but she would spend the effort needed to breed Rose, so she has no value.

Honey is a horse that belongs to Debtors' daughter. The horse is five years old, has no papers, and is used as a lesson horse. Debtor testified that she plans to make Honey profitable in competition. Debtor valued Honey at $100.

Jack is a quarter horse who belongs to Debtors' other daughter. He is papered and has a history of racing, but has a bone disease that requires veterinary care and special shoeing. His value is $300 to $400, since he is not breedable and has navicular.

Dougan is a five year old quarter horse. She has run two races, but was injured in a manner that limits her value, so she couldn't race any more. She is coming into her competition years, and Debtor intends to train her to barrel race. She has a value of $600 or $700.

The Bank's witness, Lane McBride, president of the Bank, testified about the value of the cattle and horses. In his opinion, the cattle are light commercial grade with a value of $.80 to $1.10 a pound, but he did not testify as to a total value or explain whether the dwarf cow should be valued on this basis. As to the horses which Jodi Shoemaker testified are of no value, he testified that they have killer value of $.40 to $.45 per pound. He further testified that $100 horses do not exist and values horses like Honey from $2,000 to $80,000, "depending on how they are trained and so forth." Although he disagreed with Jodi Shoemaker's values, he provided no estimates of value since he had not examined the horses.

Debtor Jodi Shoemaker has bred horses for 16 years and has raced horses for 14 years. She made money from her horses in 2002 and 2004. It is her intention to eventually make the horses profitable again by doing something with Dougan and breeding Rose.

The record does not include a copy of the Bank's note, security agreement, or evidence of perfection. Prepetition Debtors turned over the proceeds from the sale of cows to the Bank. Debtor Jodi Shoemaker testified that when the loan was made the Bank told her the four horses were not included in the Bank's collateral. Financial statements in the Bank's file signed by Debtors on April 7, 2006 included "14 head of Horse" valued at $96,000 and on December 13, 2006 included horses valued at $35,000. Debtor testified that she did not have 16 horses in 2006, but probably had five, the four at issue in this case and one additional horse who was put to sleep. A more recent financial statement prepared by the Bank and signed by the Debtors on July 2, 2007 included no horses, even though Debtors had horses at the time. The Bank's witness, the Bank president, did not testify about whether the Bank intended to take a security interest in the four horses.

**ANALYSIS.**

**A. Relief from stay.**

The Bank initially moved for relief from stay as to personal and real property on July 16, 2008.[6] It alleged that since Debtors were liquidating their business known as Concrete Walls, Inc., they no longer needed the personal property collateral. Debtors opposed the motion, but on August 20, 2008, an agreed order was entered allowing the Bank to foreclose on real property and personal property, except livestock.[7] On October 9, 2008, the Bank filed a second motion for relief from stay requesting leave "to foreclose on its secured collateral including the cattle." Debtors responded by opposing the motion for relief, denying that cause for relief existed, and

---

[6] Doc. 9.

[7] Doc. 16.

5

further answering that a motion to avoid the bank's lien in livestock was pending.[8] That lien avoidance motion addressing rights in the cows, calves, and horses was filed the same day as the objection to relief from stay.[9] Debtors later amended the lien avoidance motion to include an alternative claim for redemption.[10]

Assuming an interest in the livestock, there is no question that the Bank's interest is not adequately protected. At trial Debtors did not contest the Bank's motion for relief, other than to contend that the Bank had no interest in the horses, thereby conceding that the elements for relief from stay for cause are present.

For the following reasons, the Court finds that the Bank is entitled to relief as to the two cows and two calves but not as to the four horses. Debtors contended and the Court agrees that the Bank has not proven entitlement to relief as to the horses. First, the Bank expressly moved for relief as to cows, but did not mention horses in the motion. Its motion sought leave "to foreclose on its secured collateral including the cattle."[11] Second, relief from stay under 11 U.S.C. § 362(d) requires the movant to have an "interest in property," which, with respect to creditors seeking right to take possession of personal property, is usually a perfected security interest.[12] There is no evidence that Bank has an interest in the horses. In the second motion for relief, the Bank alleges that it is a secured creditor of the Debtors, without describing the

---

[8] Doc. 41.

[9] Doc. 42.

[10] Doc. 62.

[11] Doc. 35.

[12] There is no controversy that if the Bank has a security interest in the calves, cows, and horses the Bank may be granted relief for cause and is not adequately protected.

6

collateral.[13] Further, the Bank did not attach to its motions for relief from stay any evidence of its security interest. The Court has no copies of any notes or security agreements. The Bank did not otherwise provide a description of the collateral it alleges is subject to its interest.[14] Likewise at trial, the Bank offered no testimony and no exhibits concerning the creation and perfection of a security interest in either calves, cows, or horses.

At trial, Debtor Jodi Shoemaker did not question that the Bank has a lien in the cows and calves. She confirmed that prepetition Debtors had turned over proceeds from the sale of cows to the Bank. But she did testify that when the loan was originated the Bank officer told her that the four horses were not included in the security interest. A July 2007 financial statement prepared by the Bank includes value for Debtors' cows but no value for horses, even though Debtors owned the four horses at issue at that time. In the second motion for relief, the Bank described the relief sought as sought leave to "foreclose it secured collateral including cattle."[15] The Court therefore finds that the Bank should be granted relief as to the cows and calves but not the horses, since there is no evidence that the Bank has an interest in the four horses.[16]

---

[13] Doc. 35. In their response Debtors admitted that the Bank is a secured creditor. Doc. 41.

[14] Debtors when responding to the second motion for relief from stay by motion to avoid the Bank's lien in the livestock (Doc. 42) and later when adding redemption to this defense (Doc. 62), quote from the security agreement and allege that the Bank has an interest in the four cows and four horses. The Court declines to find this defensive allegation satisfies the Bank's burden of proof to show an interest in the horses, particularly in light of Debtor's testimony to the contrary.

[15] Doc. 35.

[16] The Court is aware it has been held that a complex question of the validity or invalidity of a lien should be litigated in an adversary proceeding and not as part of the hearing on a motion to lift the stay. *E.g., In re Waste Alternatives, Inc.*, 171 B.R.147 (Bankr. M.D. Fla. 1994). In this case the issue was not complex and there was no objection to Jodi Shoemaker's testimony that the Bank did not intend to obtain a lien in the four horses. There is no other secured party claiming an interest in the horses.

7

**B. Lien avoidance and redemption as to the cows and calves.**

Debtors filed for relief under Chapter 7 on July 4, 2008. Their statement of exemptions included four horses and eight cows, under K.S.A. 60-2304(e), the Kansas "tools of the trade" exemption. The finding that the Bank has not proven an interest in the horses required for relief from stay renders moot the Debtors' motion to avoid the alleged lien in the horses or in the alternative to redeem the horses. The lien avoidance and redemption issues will therefore be determined only with respect to the two calves and two cows.

Both the lien avoidance and redemption Code sections are predicated upon the property in issue being exempt. Section 522(f)(1), which is a subsection of the exemption section, provides in part:

> . . . the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien [satisfies certain conditions] .

Section 722 provides:

> An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien in full at the time of redemption.

In this case, the two cows and two calves are claimed exempt under K.S.A. 60-2304(e), which provides:

> Every person residing in this state shall have exempt from seizure and sale upon any attachment, execution or other process issued from any court in this state, the following articles of personal property:
> * * *
> (e) The books, documents, furniture, instruments, tools, implements and equipment, the breeding stock, seed grain or growing plants stock, or the

> other tangible means of production regularly and reasonably necessary in carrying on the person's profession, trade, business or occupation in an aggregate value not to exceed $7,500.

The Bank asserts that the livestock is not entitled to the exemption because the cows and calves are not used in the Debtors' trade or business.

There is considerable case law from the Kansas Supreme Court and Bankruptcy Courts applying the Kansas tools of the trade exemption. Under the Kansas tools of the trade exemption, "a debtor who is engaged in several occupations can claim exemption with respect to the tools and instruments used in but one of them, and that must be his main or principal pursuit or business."[17] In other words, the tools must be used in the business in which the debtor "is principally engaged."[18] To claim the exemption in bankruptcy, the general rule is that the debtor must be engaged in the trade on the date of the petition.[19] In this case, the Debtors were not engaged in raising and breeding cattle as their principal business on the date of filing or shortly before such date. Debtor Jodi Shoemaker testified that she hoped to make money from the cattle, not that the operation would become her principal business.

In support of their claim of exemption Debtors cited *In re Thompson*, 311 B.R. 822 (Bankr. D. Kan. 2004) in which Judge Berger argued that the interpretation limiting the exemption to tools used in a debtor's primary business is not required by the statutory language and is at odds with the rule that exemptions are to be liberally construed in favor of the debtor. However, when allowing the exemption in *Thompson*, he found that the tools were in fact used

---

[17] *State Bank of Kingman v. Sheperd*, 105 Kan. 206, 207-08, 182 P. 653, 653 (1919).

[18] *Jenkins v. McNall*, 27 Kan. 532, 534, 1882 WL 983 (1882).

[19] *Lampe v. Iola Bank and Trust (In re Lampe)*, 278 B.R. 205, 210 (10th Cir. BAP. 2002).

9

in the debtor's primary business.  Thus, Judge Berger's interpretation is dicta which is contrary to the long line of Kansas Supreme Court decisions, which this Court is obligated to follow.

The Court therefore concludes that the two calves and two cows are not exempt. Therefore Debtors may not avoid the Bank's lien under 11 U.S.C. § 522(f) or redeem under 11 U.S.C. § 722.  However, the Court observes that by seeking redemption under the Code the Debtors have expressed willingness and desire to retain the cows and calves by paying their value to the Bank.  The Court urges the Bank to accept this offer, even though it is not compelled to do so by the Code.  To assist in reaching agreement on this question, the Court values cows and calves at $.750 per pound.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.  A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

###